PEOPLE ex rel. DELAWARE & HUDSON CO. v. STEVENS et al.

(Supreme Court, Appellate Division, Third Department. September 24, 1909.)

1. CORPORATIONS (§ 394*)—ISSUANCE OF BONDS—POWERS OF PUBLIC SERVICE COMMISSION.

The Public Service Commission Law (Laws 1907, p. 921, c. 429) § 55, providing for the approval by the commission of the issuance of bonds by public service corporations, is valid only as an exercise of the right of the state to protect the public and the public interests, and the commission may not withhold its approval unless it clearly appears that the act of the corporation in the management of its affairs is in conflict with the public interests.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 394.*]

2. RAILROADS (§ 9*)—ISSUANCE OF BONDS—POWERS OF PUBLIC SERVICE COMMISSION.

Where a corporation organized to own and operate railroads and coal lands proposed to issue bonds secured by a mortgage of railroad property alone and the public interests would not be imperiled thereby, the Public Service Commission must approve the issue as required by Public Service

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

· Commission Law (Laws 1907, p. 921, c. 429) § 55, and they could not in-
sist that the mortgage should include coal lands as well.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 9.*]

Kellogg and Sewell, JJ., dissenting in part.

Certiorari by the People, on the relation of the Delaware & Hudson
Company, against Frank W. Stevens and others, members of and con-
stituting the Public Service Commission of the Second District, to re-
view the proceedings of the Public Service Commission refusing its
consent to relators issuing bonds secured by mortgage. Determina-
tion annulled in part, and matter remitted to the commission for fur-
ther consideration.

This is a certiorari to review the proceedings of the Public Service Com-
mission in the Second District refusing its consent to the relator issuing cer-
tain bonds secured by its first and refunding mortgage. The relator applied
July 3, 1908, to the Public Service Commission in the Second District for its
consent, under subdivision 10 of section 4 of the railroad law (Laws 1890, p.
1082, c. 565, as amended by Laws 1902, p. 1193, c. 504, § 1), to mortgage its
railroad property, rights, and franchises, by its first and refunding mortgage,
for $50,000,000, and under section 55 of the public service commission law
(chapter 429, p. 921, Laws 1907) for authority to issue $26,500,000 bonds un-
der said mortgage to refund certain outstanding notes and bonded indebted-
ness. By its order of July 7, 1908, the commission consented to the execution
of said mortgage, and authorized an issue of $19,809,000 of bonds thereunder,
and, provided that the remaining $30,191,000 of bonds should only be issued
by order of the commission. In its opinion it reserves for further application
and consideration three matters as to which it was not then sufficiently ad-
vised. Upon a further application, by order of December 7, 1908, bonds were
authorized in one of these matters, but the application for authority to issue
bonds under said mortgage in the two remaining matters was refused, and this
certiorari brings up for review the propriety of such refusal.

The ·two matters to be reviewed are: (1) In 1896 the Northern New York
Development Company, whose capital stock is owned by the relator, purchased
the securities of the Hudson Valley Railroad Company, a street surface rail-
road operating in territory which may be called tributary to the relator's lines,
and connecting with its lines at several places. These securities were turned
over to the United Traction Company, a street surface railway whose stock
is owned by the relator, operating in Troy, Albany, and neighboring munic-
ipalities, and connecting with the Hudson Valley Railway and relator's other
lines. The relator expended in purchasing this stock $4,665,295.85, and finally
received therefor $7,500,000 of the capital stock of the United Traction Com-
pany, which the Board of Railroad Commissioners authorized to issue there-
for. The relator borrowed upon its notes the money with which the purchase
of the securities of the Hudson Valley Railway Company was made, and au-
thority to refund such notes or their renewals by the issue of bonds under said
mortgage was denied by the order under review. (2) The Hudson Coal Com-
pany, all of whose stock is owned by the relator, prior to March, 1906, con-
tracted for additional coal lands in Pennsylvania, which purchases were
financed by the relator, which borrowed money upon its notes therefor. Title
to the coal lands was taken in the name of the Hudson Coal Company, or its
subsidiary companies, and certificates of indebtedness were issued by said
companies to the relator for the purchase price, about $5,000,000. The re-
lator has otherwise paid about $2,500,000 of said purchase price, and asked
authority to refund the remaining $2,500,000 by the issue of bonds under said
mortgage, which was denied.

The relator was created by special charter (chapter 238, p. 305, Laws 1823;
to own and operate coal lands in the state of Pennsylvania, and to own and
operate a canal from the Delaware to the Hudson river for the purpose of bring-
ing coal to the market. By chapter 841, p. 2106, Laws 1867, it was authorized

to own, lease, and operate railroads. Section 3 of its original charter provides: "The management and concerns of said corporation shall be entrusted to thirteen managers, who shall be stockholders." ˙

Argued before SMITH, P. J., and CHESTER, KELLOGG, COCHRANE, and SEWELL, JJ.

William S. Opdyke (Morgan J. O'Brien and Lewis E. Carr, of counsel), for relator.

Ledyard P. Hale, for defendants.

JOHN M. KELLOGG, J.  We are safe in saying from the opinions of the commissioners and the brief of their counsel that the principal reason for the refusal of the consent and authority of the commission was the fact that the mortgage in question covers only the railroad property, and not the coal lands and the trolley properties or the securities representing them.  By section 40 of the stock corporation law (Laws 1890, p. 1073, c. 564, as amended by Laws 1902, p. 1751, c. 601, § 1), which was in full force when the original indebtedness now sought to be refunded was incurred, a stock corporation may purchase, hold, and dispose of stocks, bonds, and other evidences of indebtedness of another corporation engaged in a business similar to its own. In a litigation between the relator and one of the subsidiary companies of the Hudson Valley Railway Company, it was determined that the relator must join in a connection of its tracks with those of the electric road for the interchange of business.  Matter of Stillwater & M. St. Ry. Co., 171 N. Y. 589, 64 N. E. 511, 59 L. R. A. 489.  By the decision of this court in Hudson Valley Railway Co. v. Boston & Maine Railway Co., 106 App. Div. 375, 94 N. Y. Supp. 545, it was held that the steam road must interchange cars and freights with the electric road.  It cannot, therefore, well be denied that the relator, the Hudson Valley Company and the United Traction Companies, were engaged in similar businesses.  Whether we consider the notes in question as given for the Hudson Valley securities or for the United Traction Company stock, it must be deemed that the notes represent a valid debt incurred for a lawful purpose of the relator.  The relator in borrowing money upon its notes to lend its subsidiary companies to buy coal lands, and receiving therefor the certificate of indebtedness of such companies, was, in effect, purchasing evidences of indebtedness of corporations engaged in a business similar to its own; the relator being a coal company as well as a railroad company.  These notes, assuming the transactions honest and the purchases bona fide, were obligations incurred for the lawful purposes of the relator.  To issue bonds in good faith to refund a bona fide debt is a right the relator has, and the Legislature, if it has the power so to do, never has attempted to prevent the exercise of that right.  We cannot assume that the coal lands are to be used in such a manner as to meet the condemnation of the commodities clause of the Hepburn act as interpreted by the United States Supreme Court in United States v. Delaware & Hudson Company and Others, 213 U. S. 366, 29 Sup. Ct. 527, 54 L. Ed. ⊢——.  The presumption is that the coal lands will be used in a legal way.  The coal may be sold in good faith before shipment.

The relator and the commission join issue as to the power of the commission. The relator contends that the commission is of quite limited jurisdiction in the premises; that the statute itself has defined in what cases and for what purposes a railroad corporation may issue its bonds and securities; that the commission is a statutory board whose duty in this case is solely to determine whether the proposed issues are to be made and marketed in good faith for necessary corporate purposes as defined by the statute; that it appears conclusively that the bonds desired are for the refunding, on an equitable basis, of obligations which existed against the company before the Public Service Commission law was passed, and for a purpose directly permitted by the statute; and that, therefore, the consent of the commission must follow. The commission feels that although the indebtedness was honestly incurred before the Public Service Commission law went into effect, and for a purpose mentioned in the statute as one for which bonds and mortgages may issue, nevertheless that it has a discretionary power to say whether such issues shall be permitted, and, if permitted, upon what part of the property of the corporation the security shall rest.

If we adopt the construction contended for by the relator, the validity of the statute is plain beyond question; for, when there is a statutory or common-law duty resting upon a corporation, the Legislature may vest in a commission the power to see that the corporation acts within such duty. Vil. of Saratoga Springs v. Saratoga Gas Co., 191 N. Y. 123, 83 N. E. 693, 18 L. R. A. (N. S.) 713. In such cases the statute gives the measure by which the conduct of the corporation is to be gauged and within the bounds of which it is to be kept. The powers of the commission are merely executive or administrative. If, however, the judgment and discretion of the commission is the measure of the duties of the corporation, a more serious question arises. Then the commission is not to determine whether the corporation is keeping within the law, and to make proper regulations to compel it to observe the law, but is in itself laying down new laws by which the corporation must be governed. It is enforcing its will, its law, and not the law of the state. A Minnesota statute which required the consent of its commission for an increase of capital stock, but gave no measure by which it could be determined when a corporation might or might not increase its stock, was held invalid as leaving it to the discretion and will of the commission to determine what issues of stock were proper, and what issues were improper. State of Minnesota v. Great Northern Railway Co., 100 Minn. 455, 111 N. W. 289, 10 L. R. A. (N. S.) 250. As said by Justice Brewer for a unanimous court, in Interstate Comm. Com'r v. Chicago G. W. Ry., 209 U. S. 108, 118, 28 Sup. Ct. 493, 496, 52 L. Ed. 705:

"It must be remembered that railroads are the private property of their owners; that, while from the public character of the work in which they are engaged the public has the power to prescribe rules for securing faithful and efficient service and equality between shippers and communities, yet in no proper sense is the public a general manager."

The commission stands in the place neither of the owner of the property nor of the Legislature, but is a board of public officers whose

powers are to be found in the statute, and are not to be implied or assumed. Section 3 of the charter of the relator, intrusting the management of its concerns to 13 managers, repels rather than invites the construction that the officers of the state, and not the officers of the corporation, are to manage its business. At common law the duty devolves upon a common carrier and those engaging in a similar public service to furnish to the public a reasonable service at a reasonable price. Under the police power, legislation enacted for the public health, the public welfare, and the public safety may impose additional duties upon persons and corporations, and may restrict rights which they otherwise might enjoy. Otherwise every person—and a corporation is a person within the constitutional guaranty of protection to property and liberty—has the right to carry on his own business and manage his own property in his own way. Under its police power, the Legislature may appoint a commission charged with the duty of seeing that persons engaged in a public service shall observe the obligations to the public which have been imposed upon them either by the common law or by the statutes, and may adopt reasonable regulations tending to enforce upon such persons the observance of such laws. It has not been called to my attention that any executive or administrative commission has been vested with the authority to set up its will and judgment as the measure by which the acts of a public service corporation may be tested; it being conceded that the corporation is acting in every respect according to its common-law and statutory obligations and rights.

Without further discussion, we may assume that a statute which attempted to vest in a commission a general discretion over a corporation, so that its judgment shall be the test of the propriety of the corporate acts, so that it may prevent a corporation from issuing its bonds or mortgages in good faith for full value to pay the honest debts of the corporation incurred for purposes expressly authorized by statute, would at least be of doubtful constitutionality, or a statute the validity of which cannot be said to be beyond question. In the recent case of United States v. Delaware & Hudson Company, 213 U. S. 366, 29 Sup. Ct. 527, 54 L. Ed. ——, in the United States Supreme Court, where the validity of the commodities clause of the Hepburn act was questioned, the court emphasized the rule that where two constructions of an act of legislation are permissible, one of which may render it invalid or may lead to an honest dispute as to its validity, the court will adopt that construction which removes the validity of the statute from question. With that case in mind, we have greater confidence in saying that the court will not read into an act powers not given by it when such powers make the validity of the act questionable. It therefore seems to be a proper construction of the statute in question to say that it furnishes the measure and the limit of the authority of the commission. It requires, in substance, in the case of a mortgage, that it shall only issue for the lawful purposes of the corporation, with the consent of two-thirds of its stockholders and the commission, and, in the case of bonds, that they shall issue only when necessary for the acquisition of property, the construction, completion, extension, or improvement of its facilities, for the improvement or

maintenance of its service, or for the discharge of lawful refunding obligations, "provided, and not otherwise, that there shall have been procured from the proper commission an order authorizing such issue, and the amount thereof, and stating that in the opinion of the commission the use of the capital to be secured by the issue of such stock, bonds, notes, or other evidence of indebtedness, is reasonably required for said purposes of the corporation." The commission is authorized to hold hearings "and examine such witnesses, books and papers as it may deem of importance in enabling it to reach a determination."

The stockholders' consent is required. They may arbitrarily decline to mortgage or bond their property, even though every reasonable consideration would seem to dictate that a mortgage or bond issue is necessary for the business requirements and safety of the corporation. The authority of the Public Service Commission to issue bonds, and its consent to mortgage, is required, not as an owner or as one authorized to control or manage the property or business, but as a board of public officials charged with the duty of seeing that the law is observed. Its order under section 55 authorizing such issue must state the amount thereof, and that in the opinion of the commission the use of the money to be secured thereby is reasonably required for one of said purposes. This clearly indicates that one matter only is to be determined by the commission, namely, what amount of securities, if any, is necessary to issue to produce money required for a purpose mentioned in that section. If other matters were to be determined, and the board was to place its decision upon other considerations, the statute would naturally require a statement of its conclusions upon such other matters also. In the absence of such requirement, the fact that the commission is to state the amount found necessary for a purpose mentioned indicates that that is the only matter for its determination. If the will of the commission alone is the determining guide as to when and how the stockholders of a corporation may market or issue bonds, then the statutory requirement that they may issue for certain purposes is unnecessary. The fact that the statute names the cases in which the mortgage or bonds may issue indicates clearly that the commission is to determine whether the conditions exist, and that it is not to add new conditions.

A fair construction of the statute is that bonds or stocks may issue in the cases mentioned in the statute; that, if the commission is not satisfied that the proposed issue comes within the terms of the statute, it may refuse consent, but, when the statutory requirements have been fully met, it then is the duty of the commission to grant its consent. The commission cannot find the debt one for which the statute authorizes the company to issue bonds and refuse consent because the mortgage does not cover all of the corporate property, or because the corporation and the commission disagree as to the part of the corporate property upon which the bonds should be secured.

This conclusion is the more satisfactory when we consider the salutary rule for the interpretation of a remedial statute, first, to ascertain the evil in the existing law, and then assume that the statute was intended to remedy such evil. The statutes of this state provide that no

corporation shall issue stocks or bonds except for money, labor done, or property actually received for the use and lawful purposes of the corporation, but permit a corporation to purchase property and to issue stock for the value thereof; and, in the absence of fraud in the transaction, the judgment of the directors as to the value of the property purchased is conclusive. Under this statute, many corporations issue securities in exchange for property or labor turned into the company at fictitious values, so that the securities in fact do not represent actual values, but are in common parlance known as "watered." It was deemed that such securities issued by a public service corporation were detrimental to the public interest, so far at least as the public might purchase the same, and perhaps as affecting rates to be charged the public. This statute was evidently intended to protect the public from such securities; to prevent the officers of the company from receiving fictitious values for property or services of which they might be both the buyer and seller, to enable the commission rather than the directors alone to determine whether the corporation, under the provisions of the statute, is entitled to issue the securities, and to see that they are issued at a just value so that the public interests may not be injured by the improper use or the improper disposition of them.

Another suggestion has great force confirming this construction of the statute. No authority of the Public Service Commission is required for the issue of bonds, notes, or obligations unless the time of payment thereof exceeds one year. From a business point of view the company is more apt to be wrecked or thrown into bankruptcy on account of a floating debt than by a funded debt payable upon favorable terms in the distant future. If it was intended that the commission should act in a way as guardian of the company, and see that its indebtedness should not imperil its safety, and thereby possibly injure the public interests, the question of a short-time indebtedness would have been submitted to it also because of the greater peril from such issue. But the fact that the commission only was authority over stock issues, and bond issues maturing after one year's time, indicates clearly that the object of the authority of the commission is to protect the public as would-be purchasers of the securities. The commission is not to save the company from itself or from the honest but unwise act of its officers and stockholders, in whom alone the statute has vested the power to manage its property and business, but is to protect the public from the wrongful issue of the stocks and securities in which the public are apt to deal.

It seems clear, therefore, that the authority of the commission in this case is that of an executive or administrative board charged with the duty of determining whether the proposed issue of bonds or mortgages is necessary for a purpose for which the statute permits the issue, and is to be marketed in a manner in which the company will receive the just value thereof. It was therefore the duty of the commission, upon the undisputed facts, to grant the consent and authority asked.

The same result follows if we assume that a sound discretion is lodged with the commission to refuse consent to the issue of bonds, or authority to mortgage, even though all the statutory requirements have

been fully complied with. This company is in a strong financial position, and from the fiscal showing made it is not possible that the public can be injured by a sale of its bonds at their fair value. If we assume that a stock or bond issue has a bearing upon rates, which is very doubtful, it can have no bearing upon rates whether this indebtedness is secured by a mortgage upon the railroad property alone, or upon the railroad property, the coal company collaterals, and the trolley collaterals also, or upon the coal company collaterals and the trolley collaterals each separately. If the commission is to protect the public from securities of a doubtful nature, a bond of the relator secured by its first and refunding mortgage is a security the value of which is beyond question. A collateral trust bond or a second mortgage is of less value and safety. As a matter of sound business judgment, the relator having outstanding a first and refunding mortgage for $50,-000,000 under which but about one-half the bonds have issued, it would be of doubtful propriety to put upon the market bonds secured upon the coal company collaterals and another issue of bonds secured by the trolley collaterals, or a second mortgage bond upon its railroad property also secured by the coal and trolley collaterals. It is evident that the credit of the company is better preserved and that a lower rate of interest can be obtained under its first mortgage bonds than by two issues of collateral trust bonds or by a second mortgage. It would seem, therefore, that any refunding or new financing of the company, so far as rests with the commission to determine, may better be done under its outstanding mortgage than to attempt to issue new securities of inferior grade while that mortgage is not closed.

In any event, it rests with the stockholders and officers of the company to dictate its financial policy, and to make the best possible bargain for the company in the flotation of its securities. The public interests cannot in any manner be imperiled by the method of refunding which the company has selected. Its method seems a wise and proper one, and the refusal by the commission of its consent is not a reasonable exercise of the discretion which may rest with it.

The determination is therefore annulled so far as it refuses consent and authority to issue the bonds in question, and the matter is remitted to the commission for its further action.

SEWELL, J., concurs.

SMITH, P. J. (concurring). I concur upon the ground last stated. I am not ready to agree that the commission is required to authorize the issuance of these bonds in all cases if the conditions of the statute are fulfilled. If the railroad property upon which it was proposed to make them a lien were inadequate as full security, while the company held other property which might be included in the mortgage, and which if included would give full security to the bonds, I think the commission might withhold its approval for the protection of the public, who are the ultimate purchasers. But this power would seem to be denied by the logic of Justice KELLOGG'S opinion. The necessity for this class of legislation lies in the inability of the Legislature to itself supervise the corporate acts of public service corporations.

Its justification lies in the right of the state to protect the public and the public interests. It is nowhere claimed that this commission may be vested by the Legislature with arbitrary and discretionary powers, nor is it possible in all cases to fix a specific standard by which the commission is to be guided. That standard must be at times more or less general. In the case of the Saratoga Springs v. Saratoga Gas Company, cited in Justice KELLOGG'S opinion, it was held that a commission might fix "reasonable" rates. The necessity and purpose of this legislation would themselves seem to place a limitation upon the powers of the commission and a standard by which it should be guided, to wit, the protection of public interests. In all cases it should be made clearly to appear that the act of the corporation in the management of its affairs, which is assumed to be vetoed by the commission, is an act in conflict with the public interests. Otherwise the right of the corporation to manage its own affairs would seem to be clearly guaranteed by the Constitution. I agree with Mr. Justice KELLOGG that there is nothing in the case at bar to show that the public interests are in any way imperiled by the proposed issue of bonds by the corporation, and that the Public Service Commission should, therefore, have approved of the issue.

Determination annulled so far as it refuses consent and authority to issue the bonds in question, and the matter remitted to the commission for further consideration. SEWELL, J., concurs. SMITH, P. J., concurs in memorandum, in which CHESTER and COCHRANE, JJ., concur.