**FOX v. JOHNSON & WIMSATT, Inc.**
**No. 7677.**

United States Court of Appeals for the
District of Columbia.

Decided Feb. 9, 1942.

Mr. Howard Boyd, of Washington, D. C., with whom Mr. Nelson T. Hartson and Mr. Edmund L. Jones, both of Washington, D. C., appeared on the brief, for appellant.

Mr. George E. Sullivan and Mr. William E. Leahy, both of Washington, D. C., with whom Mr. Nicholas J. Chiascione, of Washington, D. C., appeared on the brief, for appellee.

Before GRONER, Chief Justice, and MILLER and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The appeal is from a summary judgment which dismissed the plaintiff's complaint. She sought in effect specific performance of an alleged contract. She claimed it bound the defendant corporation to redeem its preferred stock from proceeds received from the sale of real estate. In the alternative she sought to have the company pay her the pro rata share she would have received, if the stock had been redeemed.

The crucial issue is the construction of a resolution of the directors adopted November 8, 1930. Plaintiff claims this converted an option held by the company into a contract binding it to redeem the preferred shares. Defendant says the resolution was merely a declaration of policy

having no contractual effect. We think the judgment must be affirmed.

The facts of the controversy are set forth in detail in an opinion of the trial court, rendered when it struck from the files certain affidavits later discussed, Fox v. Johnson & Wimsatt, D.C., 1940, 31 F. Supp. 64. For convenience, we restate the facts here. Although the suit is in form a corporate matter, the company is a family affair. All of its stock is held by the estate and the six surviving children of William A. Wimsatt, including plaintiff, his daughter. All of the children are directors. But the plaintiff is at odds with the others over the conduct of the business.

For more than forty years prior to 1923, William A. Wimsatt conducted a lumber business in the District of Columbia. In 1923 he organized the defendant corporation under the laws of Delaware to take over the business. The authorized capital stock was $3,000,000. This was divided into 20,000 preferred shares and 10,000 common shares. Each share had par value of $100. At incorporation 7,500 preferred shares were issued to Wimsatt. No other preferred shares have been issued. He also received 4,680 common shares.

In November, 1923, Mr. Wimsatt transferred 7,000 preferred shares to his seven children then living. Each received 1,000 shares. He died in February, 1929. By his will he bequeathed the remaining 500 preferred shares and all the common shares (4,680) held by him, in trust to his wife. She died in April, 1929. The trust income was to be divided in equal portions among the seven children then living. Since 1929, therefore, the children have been the virtual owners of all the corporation's outstanding stock. In January, 1930, the seven children were elected directors. All have been re-elected regularly, except that one has died. The vacancy has not been filled.

Plaintiff alleges that prior to 1930 the corporation invested unfortunately in a North Carolina enterprise. Considerable losses resulted. The directors took steps to preserve their inheritance. They inaugurated a policy to sell the real estate not actively used in the lumber business and use the proceeds to redeem issued preferred stock. The policy was declared in a resolution of the board adopted July 12, 1930: "Resolved: That with a view of buying in the preferred stock of this company, a steady and active policy be pursued of liquidating such properties and assets as can most readily be disposed of and conveniently dispensed with. To this end, the officers of the company are directed, individually, to submit at the next regular meeting of the Board, detailed written programs for the carrying out of this resolution. The officers are also directed to confer among themselves and to submit one joint plan incorporating such particulars as all the officers agree upon."

Condemnation proceedings had been instituted in September, 1929, by the District of Columbia to acquire real estate owned by the company in Squares 415 and 439 in the District of Columbia. This property was designated on the books as the Georgia Pine Property. On November 8, 1930, while the condemnation proceedings were pending, the directors unanimously adopted the resolution which is the crux of this suit. It was as follows: "Resolved: That when payment has been received by the Company for Squares 415 and 439, *being the property condemned by the District Government,* an amount of preferred stock be paid off equal to the net proceeds received from this property".[1] (Italics supplied) When the resolution was adopted, the District was expected by all to take over the property. But complications developed later, and in December, 1931, the District discontinued and abandoned the proceedings. Its right to do this was upheld in Johnson & Wimsatt, Inc. v. Reichelderfer, 1933, 62 App.D.C. 237, 66 F.2d 217. The record discloses no further efforts by the District to acquire the property for about seven years. Apparently not merely the

---

[1] When the resolution was adopted the corporation was contesting the validity of a condemnation award. Johnson & Wimsatt, Inc., v. Reichelderfer, 1931, 60 App.D.C. 186, 50 F.2d 336. Subsequent to its passage, and on December 13, 1930, plaintiff was appointed a member of an executive committee which caused an independent audit of the accounts of the business to be made. As a result of the auditor's report, the committee recommended that a policy of liquidation of the business be put into effect and expressed the conclusion that it was the intent of William A. Wimsatt, as evidenced by his will, that an orderly liquidation of the business be followed. This report was adopted by the board of directors.

proceedings, but the project as well, was abandoned.

In March, 1931, the corporation borrowed $37,500 from the National Metropolitan Bank. It used this money to redeem 375 preferred shares. This was pursuant to a resolution of the board that five per cent of the preferred stock be redeemed in lieu of a one per cent dividend previously declared on the stock. There was a second pro rata redemption of 375 preferred shares, pursuant to resolutions of November 18, 1935, and April 25, 1936.[2] To meet the cost of the second redemption and also refund the previous loan of $37,500, the company borrowed $64,500 from the National Metropolitan Bank. As security a deed of trust on Squares 415 and 439 was given.

In her amended complaint and affidavits, plaintiff alleged the first redemption was in partial compliance with what she regards as the obligation of the November 8th resolution. But she said the second redemption had no connection with this resolution because those of 1935 and 1936 called for redemption out of earnings without reference to the policy of liquidation.[3]

In August, 1938, nearly seven years after the condemnation proceedings were abandoned, the corporation sold the Georgia Pine Property to the District of Columbia for $192,000. On July 30, 1938, when the sale was imminent, disagreement developed in the board over the proposed use of the proceeds. It then passed the following resolution, with the concurrence of all directors except plaintiff: "Resolved:

Following, and in consequence of, question raised by one of the members of the Board as to the proper interpretation and effect of the resolution adopted by the Board November 8, 1930, that (1) it had no relation to net proceeds that might be derived otherwise than through the then pending condemnation proceedings, which were later abandoned, (2) it constituted merely an authorization by the Board to the proper officers of the corporation, as to the application of the funds from said condemnation proceedings if and when received, (3) such authorization was subject to any later action that the Board might take, and (4) this Board hereby directs the officers of the corporation not to apply any funds of the corporation, from whatever source derived, toward the redemption or retirement of any preferred stock, unless and until this Board so provides in a resolution hereafter adopted."

The sale was completed and the proceeds were used to pay off the National Metropolitan Bank notes and deed of trust and the dividend notes previously issued to the shareholders.[4] Plaintiff claims these payments were improper and the corporation was bound by the November 8th resolution to apply the net proceeds of this sale directly to further redemption of preferred stock.

Shortly after the sale plaintiff tendered her preferred shares to the corporation and demanded redemption of her pro rata portion. The tender was rejected. In making it she claimed the November 8th resolution was an exercise of the corporation's option to redeem, and thereby a contract for redemption arose between it

---

[2] This made a total redemption of 750 preferred shares, leaving 6,750 outstanding. Of these 900 are owned by plaintiff.

[3] The interest which the defendant corporation paid on the loans to the National Metropolitan Bank was carried on the books as an "unusual expense." Under the date of February 13, 1932, the treasurer, in a report approved by the board, reported the following: "the unusual expenses referred to above were interest on five per cent call of preferred stock *paid in contemplation of the sale* of Square 415 and part of Square 439 * * *." (Italics supplied) In a subsequent report the treasurer disclosed the payment of $2,200 for "interest on money for preferred stock called."

[4] The net return from the sale of the property was $181,650.46. The disbursements made from the proceeds were as follows: $65,664.58 to the National Metropolitan Bank for the deed of trust on Squares 415 and 439; $21,748.25 to the Metropolitan Bank in payment of notes issued by the corporation in the conduct of its business; and $84,637.20 to the estate of William A. Wimsatt and the children of William A. Wimsatt, as holders of the outstanding preferred stock, in payment of dividend notes issued by the corporation for dividends of five per cent declared during 1936 and 1937. The total disbursements were $172,050.03. The balance of $9,600.43 was held to pay fees of real estate experts and federal income taxes. The dividend notes issued to the plaintiff were not paid from the proceeds of the sale. She had previously presented them and received payment.

and the shareholders, which was specifically enforceable.

The Delaware statute (Del.Rev.Code 1935, § 2059; (c. 65, § 27) provides that a corporation may redeem all or any part of its preferred shares, if subject to redemption, at such time or times, at such price or prices, and otherwise as shall be stated in its certificate of incorporation. Defendant's certificate states that "the preferred stock shall be subject to redemption at $100 per share at any time after five years from the date of the issue thereof, at such time and place and in such manner as the Board of Directors shall determine." This is the only attribute of the preferred stock shown in the record.

The procedural history of the case is as follows. Plaintiff's original complaint, filed in January, 1939, was dismissed, with leave to amend, for failure to state a cause of action. The stated ground for dismissal was that the November 8th resolution was a mere declaration of policy, having no contractual force. The complaint was in the form of a shareholder's derivative suit for recovery of funds wrongfully paid out. It named as defendants the corporation and the directors other than plaintiff. The amended complaint, filed in June, 1939, was against the corporation only. It stated substantially the same facts as grounds for recovery. But the theory of the cause of action was a contractual right to have redemption made, alleged to have been formulated in the resolution of November 8th. The corporation filed an answer and a motion for summary judgment. The grounds for the motion were that the amended complaint set forth the same cause of action as did the original one, and that there was no genuine issue of material fact. Plaintiff filed a countermotion for summary judgment and an affidavit to support it. Then defendant moved to strike this affidavit. The court sustained the motion, setting forth its reasons in the opinion cited above. These were, in short, that the affidavit was offered to show that the directors intended the resolution, when adopted, as an exercise of the option to redeem, and therefore a binding contract to do so. The court held the affidavit, so effective, would vary and alter the terms of the resolution "by making it resolve that *whenever* Squares 415 and 439 *are sold* and payment received therefor, 'an amount of preferred stock be paid off equal

to the net proceeds received from this property.'" 31 F.Supp. at page 66. (Italics supplied.) This, it was said, could not be done by parol evidence. Consequently the court concluded the affidavit did not meet the requirement of Rule 56(e), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, "because it does not 'set forth such facts as would be admissible in evidence.'" The affidavit therefore was ordered stricken. Another was filed, which also was stricken. The court then overruled plaintiff's countermotion, granted defendant's motion for summary judgment, and dismissed the amended complaint. Of all these actions plaintiff now complains.

The substantial issue is the meaning of the resolution of November 8th. The two extremes of argument are that it was a mere declaration of policy, having no force of contract, and that it was an exercise of the corporation's option to redeem which created an obligation binding it to do so, as the trial court stated it, *"whenever* Squares 415 and 439 are *sold* and payment received therefor." (Italics supplied.) In the one view, there has never been any sort of contract to redeem. In the other, there has always been a contract for redemption, conditioned only upon a sale of the property and payment of the proceeds. The latter assumes there was no limit of time within which sale and payment should occur, but their occurrence, however remote in time, matured plaintiff's previously conditional right into an absolute one. In other words the property was, in practical effect, mortgaged for redemption of the preferred shares, but with power to sell and so apply the proceeds. Interpreted from the frame of reference of each of the parties, the resolution conceivably could be given the meaning for which each contends.

But, as often occurs when argument is pushed to the ultimate, both extremes overshoot the decisive issue. It is not necessary to decide what was the exact legal effect of the resolution when it was adopted. On the one hand, the resolution of July 12, 1930, clearly declared the general policy of liquidation and redemption of preferred stock. In view of this, to regard the November 8th resolution as merely a declaration of policy would make of it but a reiteration of policy recently declared.. The concreteness of its terms, as to the property to be disposed of, the

amount and kind of stock to be retired, and the conditions of time when redemption should occur, appear to belie this view.

■ On the other hand, the same factors negative with equal force the extreme contention of the plaintiff. To recover, it is not enough for plaintiff to show merely that the resolution had contractual effect as against that simply of stating policy, or that it bound the company to apply the proceeds received from the condemnation to redemption, or to such application of the proceeds of some sale made in lieu of condemnation, or those of a sale entirely disconnected from the condemnation but occurring shortly after the proceedings terminated or within a reasonable time thereafter. Each of these constructions *might* be possible, if facts were presented to which it could be applied. But there are no such facts. There was no condemnation. There was no sale in lieu of the condemnation. There was no disconnected sale occurring shortly after the proceedings ended or within any reasonably implied period of time for the resolution's contractual operation. The only sale which occurred, and from which payment was received, is the one which took place approximately seven years after the condemnation proceedings ended and nearly eight years after the resolution was passed. Plaintiff, to recover must show that this sale and this payment were contemplated by the resolution and in such manner as to give her a right of contract to have its proceeds applied to redeem her shares.[5] If she has done this, she is entitled to relief. If she has not done it, the contrary is true, regardless of what might be the legal effect of the resolution in any of the various possibilities of circumstance which might have been, but are not, before us. She has not sustained the burden. The facts which she has set forth are not legally sufficient to do so.

■ The certificate of incorporation gave the company an option to redeem the preferred shares according to its terms.[6] Together with the statute, cited above, it empowered the directors to exercise the option and purchase the stock at $100 per share at such time and place and in such manner as they should determine.[7] But the shareholders could not specifically enforce redemption until two things took place. One was that the directors should exercise the option, definitely and contractually, in accordance with the power conferred on them.[8] The other was that valid conditions imposed by them in exercising it be fulfilled.[9] A resolution merely declaring a policy of redemption, without specifying definite terms, would not be an exercise of the option or binding contractually. A conditional exercise of the option would create contractual rights. But it would not mature into an enforceable right of redemption, if the conditions specified should fail to materialize.[10]

■ On its face the resolution was at most a conditional exercise of the corporation's option. It required disposition of the property and receipt of payment by the company to mature the shareholders' right of redemption. But the decisive question is, what disposition and what payment? Plaintiff says, in effect, any disposition whether by sale or by condemnation, however nearly or remotely made in time. Upon its face the resolution does not re-

---

[5] For the full relief she claims, she should show also that none of the proceeds, including funds derived from incumbrances made in anticipation of sale, cf. note 3 supra, have been so applied.

[6] In effect the shareholder contracts his shares shall be redeemable at the corporation's option: Yoakam v. Providence Biltmore Hotel Co., D.C.R.I.1929, 34 F. 2d 533, 541; Mannington v. Hocking Valley Ry., C.C.S.D.Ohio 1910, 183 F. 133, 143; Corbett v. McClintic-Marshall Corp., 1930, 17 Del.Ch. 165, 151 A. 218; Westerfield-Bonte Co. v. Burnett, 1917, 176 Ky. 188, 195 S.W. 477; Crimmins & Peirce Co. v. Kidder Peabody Acceptance Corp., 1933, 282 Mass. 367, 185 N.E. 383, 88 A.L.R. 1122; Ammon v. Cushman Motor Works, 1935, 128 Neb. 357, 258 N.W. 649; Koeppler v. Crock-er Chair Co., 1930, 200 Wis. 476, 228 N.W. 130; 11 Fletcher, Cyc. Corp., Perm.Ed.1932, §§ 5295, 5309.

[7] Mannington v. Hocking Valley Ry., C.C.S.D.Ohio 1910, 183 F. 133, 143.

[8] Inscho v. Mid-Continent Development Co., 1915, 94 Kan. 370, 146 P. 1014, 1021, Ann.Cas.1917B, 546; Corbett v. McClintic-Marshall Corp., 1930, 17 Del. Ch. 165, 151 A. 218; cf. Gunther Grocery Co. v. Hazel, 1918, 179 Ky. 775, 201 S. W. 336; Westerfield-Bonte Co. v. Burnett, 1917, 176 Ky. 188, 195 S.W. 477; Stasek v. Marshall-Wells Co., 1935, 194 Minn. 564, 261 N.W. 398.

[9] Inscho v. Mid-Continent Development Co., 1915, 94 Kan. 370, 146 P. 1014, 1021, Ann.Cas.1917B, 546.

[10] Ibid.

quire, if possibly it could be strained, to mean this. There is no specific reference to any sale. The only one is to condemnation. The term "payment" does not stand independently, disconnected from the reference to the pending condemnation. It is part of the same sentence and idea. Plaintiff seems to regard the clause, "being the property condemned by the District Government," as merely descriptive of the property. So to limit it would make it redundant in a sentence, every other word of which is packed with independent meaning. We think the clause is descriptive of the intended disposition, not merely of the property affected. From its letter, therefore, and wholly apart from extraneous circumstances, the natural and reasonable interpretation of the resolution is that the corporation agreed to apply the proceeds received from the condemnation to retirement of preferred shares. At most, according to the letter alone, this could be extended to include a sale made in lieu of condemnation. But if it were enlarged further, so as to include one entirely disconnected, in inducement and time, from the condemnation proceedings, we do not think it can be stretched out to include a sale made eight years later. In terms, it specifies no time limit for maturing the conditions of sale and payment. That element cannot have been intended to endure without limitation throughout the future. The rule of reasonableness supplies the time element generally when it is not specified.[11] Here eight years would be clearly unreasonable.

▮▮▮ This view is supported by reading the resolution in the light of the general policy of liquidation and redemption, the other circumstances surrounding its adoption, and the subsequent conduct of the corporation and the directors, in some of which plaintiff participated or acquiesced. To place the resolution in its factual setting, thereby explaining its terms or applying it to its proper object and subject matter, does not violate the parol evidence rule.[12] The general policy was not a long-run policy. It was one of retrenchment. To be effective it required immediate, though not hurried, action. Into this the contemplated condemnation fitted nicely. So might have a sale in lieu of condemnation. Whether one to be made eight years later would do so was then clearly beyond reasonable estimation. The condemnation was then pending. The resolution expressly recognizes this. It makes no reference to any other sale or disposition, pending, completed, contemplated, or possible. It conditions redemption on payment actually received. We think it does so in terms which show the payment in mind was not any payment, however remote or improbable of being realized, but one presently pending and portended by existing circumstances. Taking together the language "when payment has been received" and "being the property condemned by the District," reading them in the light of the purpose of the general policy, and of the prevailing circumstances, we find no room for reasonable inference that a sale to occur eight years later was intended.

The subsequent actions of the company bear out this view. These include its efforts to keep the condemnation proceedings from being discontinued, encumbrancing the property when these failed, and the resolution subsequently adopted by the directors. That of July 30, 1938, set forth

---

[11] See, e. g., Bogart v. George K. Porter Co., 1924, 193 Cal. 197, 223 P. 959, 31 A.L.R. 1045; Herkner v. Rubin, 1932, 126 Cal.App. 677, 14 P.2d 1043; Wisconsin Club v. John, 1930, 202 Wis. 476, 233 N.W. 79; Harris v. McPherson, 1922, 97 Conn. 164, 115 A. 723, 24 A. L.R. 1530; 1 Williston, Contracts, Rev. Ed.1936, §§ 38, 54; 4 Id. § 1027A.

[12] Parol evidence may be received not only to explain terms of doubtful import, but to aid the integration in order to establish a particular document or to apply it to its proper subject matter. Bradley v. Washington, etc., Packet Co., 1839, 13 Pet. 89, 99, 10 L.Ed. 72; Harten v. Loffler, 1907, 29 App.D.C. 490, affirmed, 1909, 212 U.S. 397, 29 S.Ct. 351, 53 L. Ed. 568; Sampliner v. Maryland Casualty Co., 6 Cir., 1933, 63 F.2d 332. Where the intent of the parties is not clear as to the object of the language used in the integration, it will be construed in the light of the circumstances surrounding the parties when the integration took place and in the light of the practical interpretation given to the controverted portions by their conduct. Sand Filtration Corp. v. Cowardin, 1909, 213 U.S. 360, 29 S.Ct. 509, 53 L.Ed. 833; Bradley v. Washington, etc., Packet Co., supra; Harten v. Loffler, supra; Beneke v. Moss, 4 Cir., 1931, 46 F.2d 948; Cory v. Hamilton Nat. Bank, 6 Cir., 1929, 31 F.2d 379, 382; cf. Bertelsen & Petersen Engineering Co. v. United States, 1 Cir., 1932, 60 F.2d 745.

above, shows that all except plaintiff then thought the resolution of November 8th was merely an authorization to the officers to use the condemnation proceeds, and only those funds, to redeem preferred shares. It also shows that the board did not then regard the previous resolution as having bound the company by an exercise of the option. The company's effort to have the condemnation carried through, after the District decided to terminate the proceedings, lends weight to the more limited view of the resolution's scope. The directors wanted the transaction carried out so that the proceeds, as the resolution required, would be utilized for their personal as well as the corporate benefit. When the effort failed, the company set about dealing with the property in a manner hardly consistent with the idea that it was regarded any longer as having possibilities, or at any rate probabilities, of fitting into the program of liquidation and redemption in the manner specified in the resolution. If other sales had been contemplated as being within its terms, the policy of borrowing upon it as security to obtain money for redemption and other purposes hardly would have been hit upon. The plaintiff participated in and benefited by some of these actions.

We think therefore that the resolution, if it contemplated any sale and payment other than pursuant to the proposed condemnation, contained the implied limitation that they should be made within a reasonable time. Furthermore, eight years was unreasonable, in view of all the circumstances, including the nature and purposes of the general policy of liquidation and redemption. Consequently the resolution became functus officio as to any contractual effect it may have had before the 1938 sale.

There was therefore no reversible error in any of the trial court's actions. That is true, though our reasons for sustaining them differ somewhat from its own. Plaintiff complains because her affidavits supporting her countermotion for summary judgment were stricken.[13] Perhaps it would be a sufficient answer that by filing the motion, she conceded there was no "genuine issue as to any material fact," Rule 56(c), Fed.Rules Civ.Proc., and therefore, that judgment on the pleadings was proper.[14] But beyond that the affidavits did not set forth matter sufficient to prevent a summary judgment. Plaintiff's purpose in filing them was to show that the directors intended the November 8th resolution as an exercise of the company's option. The trial court construed it as a mere declaration of policy. Therefore it excluded the affidavits, offered for the purpose stated, as tending to vary the resolution's terms. In our view the resolution may have had contractual effect, though not in application to the 1938 sale. If so, the affidavits would tend to support, rather than alter, the resolution's terms to the extent of showing or tending to show it was contractual in character. Consequently their exclusion may have been technically in error.[15] But, if so, it was harmless. Had the affidavits been retained in the files, the result should not have been different.[16] They did not state facts sufficient to create a "genuine issue as to any material fact," within Rule 56(c), upon the controlling issue in the case, namely, the time during which the contract, if there was one, should be operative. The pleadings set forth the facts essential for deciding whether the resolution contemplated a sale made in 1938. There was conflict concerning interpretation of the facts and the ultimate conclusion to be drawn from them respecting intention. But there was none as to the facts themselves. In other words, the evidentiary facts were not substantially in dispute. The stricken affidavits were not different

---

13 See the opinion referred to in the text supra, 31 F.Supp. at page 64.

14 Cf. Sena v. American Turquoise Co., 1911, 220 U.S. 497, 500, 31 S.Ct. 488, 55 L.Ed. 559. See, also, note 18 infra.

15 Cf. note 12 supra. Cf. also Gill v. Benjamin Franklin Realty & Holding Co., 3 Cir., 1930, 43 F.2d 337, 339; Powers v. Maryland Casualty Co., D.C.Mass. 1928, 25 F.2d 890. For the application of the parol evidence rule to corporate records, see, Shuman v. Main, etc., Fire Ins. Co., 1919, 265 Pa. 38, 108 A. 265; Lawrence v. Premier Indemnity Assurance Co., 1919, 180 Cal. 688, 182 P. 431; Michaels v. Pacific Soft Water Laundry, 1930, 104 Cal.App. 349, 286 P. 165, 1071; 9 Fletcher, Cyc. Corp. Perm.Ed.1931, § 4658.

16 Hence, their exclusion was not ground for reversal. Cf. Corrigan v. United States, 9 Cir., 1936, 82 F.2d 106, 109; Hays v. Harris, 8 Cir., 1935, 78 F.2d 66, 71, certiorari denied, 1935, 296 U.S. 613, 56 S.Ct. 134, 80 L.Ed. 435; Edwards v. Robinson, 9 Cir., 1925, 8 F.2d 726.

from the pleadings in this respect. Apart from the interpretative conclusions, they merely set forth the circumstances surrounding adoption of the resolution and subsequent resolutions and corporate acts. Their effect was merely to paraphrase the facts stated in the pleadings, adding detail and interpretative matter.[17] Conflict concerning the ultimate and decisive conclusion to be drawn from undisputed facts does not prevent rendition of a summary judgment, when that conclusion is one to be drawn by the court.[18] The court had before it all the facts which formal trial would have produced. Going through the motions of trial would have been futile. Judgment therefore was given properly for the defendant.

Affirmed.

---

[17] Cf. Fox v. Johnson & Wimsatt, D.C. 1940, 31 F.Supp. 64.

[18] Cf. Farley v. Abbetmeier, 1940, 72 App.D.C. 260, 114 F.2d 569; Fletcher v. Evening Star Newspaper Co., 1940, 72 App.D.C. 303, 114 F.2d 582; Empire Carting Co. v. Employers' Reinsurance Corp., 2 Cir., 1933, 64 F.2d 36; Maryland Casualty Co. v. Sparks, 6 Cir., 1935, 76 F.2d 929; Downey v. Banker, D.C. S.D.N.Y.1940, 32 F.Supp. 874; Sun Oil Co. v. Blevins, D.C.W.D.La.1939, 29 F. Supp. 901, 909.